[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In these four cases, tried to the court, the facts are interwoven and were presented in the one hearing in the consolidation of all four matters. For clarity, the court will discuss and render its decision in each case separately. The four cases are: Harbor Plaza Associates v. Harbor Vista AssociatesLimited Partnership. (The Foreclosure) Harbor Vista AssociatesLimited Partnership v. Harbor Plaza Associates (The Declaratory Judgment) Harbor Vista Associates Limited Partnership v. YankeeManagement, Inc., Arthur D. Emil and Arthur Collins, (The Guaranty of Reserves) and Harbor Vista Associates LimitedPartnership v. Yankee Management, Inc., (The Entry and Detainer)
 I. THE FORECLOSURE
This action, Harbor Plaza Associates v. Harbor Vista Associates Limited Partnership (CV95 0142917S), is the case upon which both parties focused most attention at trial, and apparently is the proceeding which precipitated all the others. The debt secured by the mortgage sought to be foreclosed is claimed to be in excess of $206,000,000. The issue for the court is whether the mortgage is, in fact, in default. To decide that question, the court must among other things, interpret the meaning as used in the mortgage of ten words, ". . . aggregate debt service required to be paid under the Notes. . .". To steal a phrase, never have so few words meant so much to so many.
For a full understanding of the question, we must take a close look at the parties and at the transaction giving rise to the mortgage. It involves perhaps one of the most complex and sophisticated financing of a loan ever devised. From testimony and exhibits, the court finds the following facts essential to CT Page 9142 this case.
In the late 1970's the plaintiff, Harbor Plaza Associates ("Harbor Plaza") had constructed a new facility on waterfront property in Stamford consisting of five commercial buildings, primarily for office use, with some retail and restaurant use. To construct the buildings, consisting of some 725,000 square feet, the plaintiff had received a $90,000,000 construction mortgage from Aetna Insurance Co.
When it came time to pay the construction mortgage, the plaintiffs could not obtain a conventional loan in the amount needed, and had to settle for a $60,000,000 permanent mortgage granted by Aetna. Since $30,000,000 more was needed, the plaintiffs approached Integrated Resources, Inc. ("Integrated"), a syndicator of real estate and tax shelters, for the purpose of obtaining the additional sums. Several months of negotiations followed, with Arthur Emil, as a general partner of Harbor Plaza, and one Daniel A. Davis acting for Integrated. Both sides were represented by qualified counsel throughout the transaction. It was important to Integrated, in its offering to investors, that the transaction be so structured that the mortgage interest payable be as close to fully deductible as possible; indeed, it seemed important to set up the transaction as a bona fide equity acquisition, with sufficient probability of a true economic benefit accruing to the investors in order to pass Internal Revenue Service ("IRS") muster. To accomplish these goals, Integrated formed a limited partnership known as Harbor Vista Limited Partnership ("Harbor Vista"), the defendant in this case. The parties then proceeded to close the transaction on July 20, 1982 by Harbor Plaza conveying title to the five buildings, but not the land, to Harbor Vista, for which Harbor Vista paid Harbor Plaza $135,000,000. Of that sum, $30,000,000 was paid in cash (which covered the shortfall on the Aetna construction mortgage), and $105,000,000 by Harbor Vista executing two promissory notes in the amount of $100,000,000 and $5,000,000, both secured by a $105,000,000 purchase mortgage on the buildings in favor of Harbor Plaza. The Notes mature on August 10, 2022, and the mortgage is junior to and "wraps around" the Aetna first mortgage, meaning the mortgagee (Harbor Plaza) is obligated to make the payments on that indebtedness. In addition to conveying the buildings to Harbor Vista, Harbor Plaza also granted to Harbor Vista a 90 year ground lease of the land upon which the buildings are situated. CT Page 9143
The Notes and mortgage were so structured that the mortgagor (Harbor Vista) could defer actual interest payments called for by the Notes, and yet take the interest as current deductions for the benefit of the investors. However, to remain true to the indicia of bona fide ownership, it was necessary to put some limitations on the amounts of accrued interest and the length of time during which it could be accrued.
Simply stated then, the parties provided for Harbor Vista to pay Harbor Plaza all cash flow generated by the facility (to be augmented during the first five years of the loan by the payment of an additional $1,395,000 representing Debt Service Shortfall). As long as Harbor Vista continued to do so, it would not be in default of the mortgage, and no foreclosure could be brought by Harbor Plaza unless, pursuant to the provisions of paragraph 16(a)(ii) of the mortgage, Harbor Vista became "in arrears in the payment of all sums owing under the Notes by more than an amount equal to the aggregate debt service required to be paid under theNotes for the immediately preceding seven year (7)-period." (Emphasis added).
The Notes require payments, during the period relevant to this case, of interest only at the rate of 18.4% per annum. The mortgage permits payments of a lesser amount, but equal to all cash flow during the same period. It is virtually undisputed that Harbor Vista carries an arrearage of some $100,000,000 as of December 31, 1994, that interest on the $105,000,000 principal of the Notes for seven years at the rate of 18.4% is $135,240,000, and that the last seven years of cash flow is approximately $82,250,000. One sees, then, that if the arrearage is compared to the 18.4% interest rate, it is less than $135,240,000 and the mortgage is not in default; but if compared with the cash flow of the project, $82,250,000 for the same period, the arrearage is substantially greater and the mortgage is in default.
The plaintiff's interpretation of paragraph 16(a)(ii) that the clause is referring to cash flow for the preceding seven years was presented to the court skillfully, creatively and enticingly. However, the court is persuaded by the defendant's argument that 16(a)(ii) is referring to the 18.4% per annum (coupon rate) of the Notes. The court is drawn to that conclusion by the very words of the clause, by the testimony it heard, and by the clear intent of the parties.
A written instrument should be construed and enforced in CT Page 9144 accordance with the intent of the parties as expressed in the language of the contract. Schatz v. Hartford Fire Insurance Co.,213 Conn. 696, 702, 569 A.2d 1131 (1990). Paragraph 16(a)(ii) of the mortgage forbids the mortgagee from declaring a default so long as "The mortgagor is at no time in arrears in the payment of all sums owing under the Notes by more than an amount equal to the aggregate debt service required to be paid under the Notes for the immediately preceding seven (7)-year period)."
The defendant, Harbor Vista, asks the court to accept these words at face value, and the court does so for a number of reasons. There is indeed a "debt service required to be paid under the Notes", i.e., interest at 18.4% on the principal of $105,000,000. The fact that the mortgage permits the mortgagor to pay cash flow for a period of time, and still not be in default, does not change the formula employed by the parties to judge whether a default has actually occurred, that is, arrears do or do not exceed the "aggregate debt service required to be paid under the Notes for the immediately proceeding seven year (7)-period." The Notes are the only instruments requiring payments of anything; the mortgage merely sets up a formula whereby the mortgagor may pay less than the Notes require, i.e., cash flow, without being subject to foreclosure. In this painstakingly drafted instrument, surely the drafters could easily have used the phrase "net cash flow" in the disputed clause were that the intended benchmark.
The court is bolstered in its view by the uncontroverted testimony of Benjamin Fein, the attorney who drafted paragraph 16(a)(ii) of the mortgage, that the disputed language was intended to refer to the 18.4% interest rate because this is what would allow, hopefully, a deduction for all or most of said interest, without running afoul of tax laws. If the language were deem to mean "cash flow", Mr. Fein testified "there would be a significant risk that the IRS would say only the amounts required to be paid, and therefore [were] paid, were deductible." This could result in the disallowance of deductions to the investors of some $100,000,000 over the accrual period of 15 years.
It is true that paragraph 16(a)(ii) was inserted in the mortgage at the behest of Harbor Vista. However, there is no evidence that it was not agreed to by Harbor Plaza, or that Harbor Plaza representatives were not explained the reasons for the clause, or did not understand it, or had any understanding of its meaning other than that of Harbor Vista's, and of the words CT Page 9145 themselves as written. The actual understanding of the parties can be given effect by the trier of the facts; see Campbell v.Rockefeller, 134 Conn. 585, 590, 59 A.2d 524 (1948) and the court does so in this case.
The court is also persuaded that in this carefully crafted transaction, which both parties agreed was to be a cash flow transaction, with the mortgage being virtually non-foreclosable for many years, an interpretation of the formula which would place the mortgage in substantial jeopardy of default, was not intended by either party. Yet, that is precisely what could, and did, happen under the plaintiff's interpretation of the disputed phrase. The court finds that the "cushion" between the accumulated unpaid interest and the amount of seven years of cash flow would have become unacceptably small, and could not have been and was not intended by the parties to be the measure of foreclosability of the mortgage.
The plaintiff asks the court to resolve the ambiguity of paragraph 16(a)(ii) of the mortgage against the drafter, Harbor Vista. Sturman v. Socha, 191 Conn. 1, 9, 463 A.2d 527 (1983). The problem with this request is that the court views the ambiguity, if any, to have been resolved by the clear intent of the parties in choosing the words employed, in attempting to adhere to the requirements of the IRS. There is no evidence that the plaintiff, at the time of executing the transaction, had any other intent regarding the meaning of 16(a)(ii) than did the drafter, and the court need not, therefore, construe the language against the drafter. See Larson and Sakiva Assoc. Inc. v. Hanover Int'l.Inc., Conn. Superior Ct. January 2, 1991; Connecticut Bank andTrust Co. v. Trolley Barn Co., Conn. Sup. Ct. January 4, 1991. The court has reviewed all the testimony[1] alluded to by the plaintiff in its extensive brief, the words, phrases and clauses contained in the Notes, the mortgage, and the confidential offering memorandum, and finds no conflict among the documents with respect to the meaning of paragraph 16(a)(ii) of the mortgage. We believe the plaintiff failed to find these documents fully reconcilable because it does not recognize a basic premise, that is, that while all parties were aware that the arrangement was a "cash flow transaction" this is to be distinguished from the actual formula applied as a test to meet IRS requirements. And there is nothing in the nature of permitting the cash flow payments which undermines the application of the test as it needed to be structured, and as it was intended. CT Page 9146
Harbor Plaza also claims a default under paragraph 16(a)(i) of the mortgage because it alleges that Harbor Vista failed to pay the net cash flow to Harbor Plaza for the months of February and March, 1995. Harbor Vista, however, had terminated the management agreement with Yankee Management, Inc. in January of 1995 (See Part III, infra), and withheld payment of cash flow because it used the rents collected to pay expenses, which it had every right to do under the mortgage documents. The plaintiff has failed in its burden of proof by the preponderance of the evidence regarding this allegation.
Harbor Plaza further claims a mortgage default because Harbor Vista has violated the assignment of rents given as additional security for the loan. The simple answer to this claim is that, by this decision, there has been no default; the assignment of rents was made conditional upon default by the mortgagor, and thus the plaintiff never became entitled to the rents.
Finally, the plaintiff advances the theory that Harbor Vista triggered an event of default when it applied for the appointment of receiver in violation of the mortgage. In fact, a motion for an appointment of a receiver was made by the plaintiff, who then failed to proceed with it. Only then did the defendant move for a receiver to govern the receipts and disbursements of rental income during the pendency of this action. With the intervention of the court, and the cooperation of the parties, an order was entered by stipulation resolving this issue. The defendants' filing of a motion for appointment of receiver, under the circumstances of this case, was not prejudicial to the plaintiff, did not constitute a material breach of the provisions of the mortgage, and was not an event of default.
Both parties have called to the court's attention, both at trial and in their post-trial memoranda, the fact of an option held by Harbor Plaza to buy the property after 1997. The payment for the option, which Harbor Plaza is required to exercise, is $25,000,000 and payment must be made by July 1997. The $25,000,000 is secured by a mortgage from Harbor Plaza to Harbor Vista on the underlying land. If the $25,000,000 is not paid as scheduled, Harbor Vista could foreclose the mortgage, and the $105,000,000 mortgage would be wiped out. Likewise, if the $105,000,000 were to be successfully foreclosed, Harbor Plaza's obligation to make the option payment would be eliminated. These facts are illuminating to explain the motivations held by both parties and the vigorous prosecution and defense of these various CT Page 9147 law suits, but were irrelevant to the issues decided by the court.
For the foregoing reasons, the court finds that no event of default has occurred and judgment in this foreclosure action may enter in favor of the defendant.
The defendant has filed four counterclaims against the plaintiff. In the first, Harbor Vista alleges that Harbor Plaza wrongfully induced Yankee Management, Inc. to breach its duty of loyalty owed to Harbor Vista. In the second, the defendant claims that the plaintiff instituted the foreclosure action in bad faith, that is to avoid paying a $25,000,000 option note. In both these counterclaims the defendant has failed to meet its burden of proof. The third and fourth counterclaims contain allegations that the plaintiff artificially lowered the Net Cash Flow by treating certain attorneys fees as expenses. However, the defendant has not, by a preponderance of the evidence, proven its damages arising out of such action of the plaintiff. "It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . ." (Citations omitted; internal quotation marks omitted.) Expressway Associates II v. Friendly Ice Cream Corp.,218 Conn. 474, 476-77, 590 A.2d 431 (1991).
The court finds the issues on the defendant's counterclaims in favor of the plaintiff.
 II. THE DECLARATORY JUDGMENT
The court's decision in the foreclosure case addressed in section I above, renders moot the Declaratory Judgment action brought by Harbor Vista against Harbor Plaza.
 III. THE GUARANTY OF RESERVES
This is an action brought by Harbor Vista against Yankee CT Page 9148 Management, Inc. ("Yankee"), Arthur Collins ("Collins") and Arthur Emil ("Emil") seeking damages in the amount of $2,575,040 and, in the case of Collins and Emil, interest at the contractual rate of 20.25% and legal fees and expenses; the plaintiff further seeks an order requiring Yankee to turn over the books, records, accounts and other documents relating to Harbor Plaza. Also requested by Harbor Vista is a declaratory judgment that it has effectively terminated a management agreement with Yankee, and an injunction prohibiting Yankee from denying the plaintiff access to the project.
To determine the issues raised by the pleadings, one must turn to the management agreement ("Management Agreement") entered into on July 20, 1982 between Harbor Vista and Yankee, in which Harbor Vista appointed Yankee the management agent of the project owned by Harbor Vista. The Management Agreement is an exhaustive declaration of the obligations and duties of Yankee, and provides for termination by Harbor Vista in the event of default.
By letter dated August 10, 1994 Harbor Vista served a notice of default of the Management Agreement upon Yankee, claiming first and foremost that Yankee had failed to make required additions to the reserve funds (for future tenant fit-up) and to maintain the reserves pursuant to the terms of the Management Agreement. This notice of default came five days after Harbor Vista received from Harbor Plaza notice of default under its mortgage, contained a number of other claimed defaults which had occurred sometime earlier and which the court finds did not constitute material breaches of the Management Agreement.
As for the obligation of Yankee to establish and maintain reserves the court finds there is no such enforceable obligation. The language of the Management Agreement, paragraph 3(h) undermines any argument to the contrary. That paragraph allows Yankee to commingle the "reserve" funds with its own; calls for them to bear no interest, and requires Yankee to utilize such funds only if the net cash flow of the project is insufficient to cover the required alterations for tenants. It is also noteworthy that the default provisions of this detailed Management Agreement do not specifically make the failure to add to the reserve an event of default. See Management Agreement, paragraph 10(a). In point of fact, paragraph 10(b) convinces the court that if Yankee has any obligation to pay the reserves, it comes upon termination of the Management Agreement.[2] Further evidence as to the extent of Yankee's reserve obligations comes from a reading of CT Page 9149 the Reserve Guaranty (Exhibit F) executed by the defendants Collins and Emil. The guaranty is of the managing agent's obligation "to pay or cause to be paid to Harbor Vista the amountcontained in the `Reserve' maintained under subparagraph 3(h) ofthe Management Agreement on the Termination Day of the Management Agreement". (Emphasis added). From the interpretation of the various agreements it is clear that the intent of the parties was that there be imposed upon Yankee an obligation to pay for alterations out of reserves only if the cash flow to do so was insufficient, and that Harbor Vista would be entitled to be paid such reserves only upon a termination of the Management Agreement.
There remains the issue of whether Harbor Vista is also entitled to "all amounts that the Managing Agent would have been obligated thereafter to add to the Reserve had this agreement not been so terminated". See Management Agreement, paragraph 3(h). The agreement unambiguously states that Harbor Vista shall receive such amounts ". . . in the event that this Agreement shall have terminated pursuant to the provisions of paragraph 10 hereof . . .". Because the court has found that the failure to add and to maintain reserves is not an event of default under the Management Agreement, and that the other claims of default do not constitute material breaches thereof, Harbor Vista is not entitled to such additional reserves. Likewise, Collins and Emil's guarantee is confined to "the amount contained in the `reserve' maintained under subparagraph 3(h) of the Management Agreement on the Termination Date (as defined in the Management Agreement) of the Management Agreement . . .". See Reserve Guaranty, paragraph 1. Only had the Management Agreement been terminated ". . . due to the occurrence of an event of default . . ." pursuant to paragraph 10(a) of the Management Agreement would these two defendants have been required to pay Harbor Vista ". . . any amounts the managing agent would have been obligated thereafter to add to the Reserve had the Management Agreement not been so terminated."
Nevertheless, Harbor Vista's termination of the Management Agreement was effective albeit no event of default was proven to the satisfaction of the court. The plaintiff had a right to terminate the agency without cause. See Restatement Agency 2d §§ 11 8(b), 463; 3 Am.Jur.2d Agency, § 43. By its letter to Yankee dated January 16, 1995, Harbor Vista intended to and did terminate the Management Agreement. Harbor Vista, then, is entitled to possession of the premises and the return of books, CT Page 9150 records and accounts which Yankee, undisputably, continues to hold. The court finds that such conduct by Yankee will cause irreparable harm to the plaintiff for which it has no adequate remedy of law. The rights of Yankee, if any, with respect to said unilateral termination need not be addressed or decided in this litigation.
Because the Management Agreement was not terminated pursuant to the provisions of paragraph 10 thereof, Harbor Vista is entitled only to payment of the amount of the reserve which it may have proven is held by the managing agent. The court finds that at the time of the trial of this matter, some $300,000 was available as reserves. From the evidence presented, the court further finds the reserve funds that would have been available had Yankee completely funded the reserve, exceed said amount, and thus the plaintiff, Harbor Vista, is entitled to the receipt of the available funds.
Accordingly, judgment may enter in favor of the defendant on the plaintiff's monetary claims against them. The court further enters judgment declaring:
 a) The plaintiff has effectively terminated the Management Agreement.
 b) Yankee's retention of Harbor Vista's cash, records and accounts is improper and unlawful, and
 c) Yankee's denial to Harbor Vista of the use, possession or control of the project is improper and unlawful.
The court further orders Yankee to turn over to Harbor Vista its books, records, accounts and other documents relating to the subject premises.
The court further orders that Yankee is enjoined:
a) From denying plaintiff access to the premises.
 b) From denying plaintiff access to the books, records and accounts relating to the project.
 c) From interfering in any way with plaintiff's management, dominion and control of the project.
CT Page 9151
 IV. THE ENTRY AND DETAINER
The court's finding in the "Guaranty of Reserves" case addressed in Section III above, and the orders entered therein, render moot the entry and detainer action brought by Harbor Vista against Harbor Plaza.
So ordered.
D'ANDREA, J.